**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ROBERT FRANKLIN

     *Plaintiff*,

v.

UNITED STATES OF AMERICA;

DEPARTMENT OF HOMELAND
SECURITY;

ALEJANDRO MAYORKAS, Secretary of
Department of Homeland Security, in his
official capacity;

TERRY MUISE, Special Agent of
Department of Homeland Security, in his
individual capacity;

MARK SHOFFNER, Task Force
Officer of Department of Homeland
Security, in his individual capacity;

TRANSPORTATION SECURITY
ADMINISTRATION;

DAVID P. PEKOSKE, Administrator of
Transportation Security Administration
of Department of Homeland Security, in
his official capacity;

DRUG ENFORCEMENT
ADMINISTRATION;

ANNE MILGRAM, Administrator of
Drug Enforcement Administration, in
her official capacity; and

HOUSTON POLICE DEPARTMENT;

     *Defendants.*

Civil Action No.

**COMPLAINT**

**JURY DEMANDED**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR
INDIVIDUAL RELIEF OF RETURN OF PROPERTYAND COMPENSATORY
DAMAGES AND ATTORNEY FEES**

# TABLE OF CONTENTS

Introduction ................................................................................................................... 1

Jurisdiction .................................................................................................................... 2

Venue ............................................................................................................................ 2

Parties ........................................................................................................................... 3

    A.  Plaintiff Robert Franklin ................................................................................. 3

    B.  Defendant United States of America ............................................................... 3

    C.  Defendant Department of Homeland Security (DHS) ..................................... 3

    D.  Defendant Alejandro Mayorkas ...................................................................... 4

    E.  Defendant Terry Muise ................................................................................... 4

    F.  Defendant Mark Shoffner ............................................................................... 5

    G.  Defendant Transportation Security Administration (TSA) .............................. 5

    H.  Defendant David P. Pekoske ........................................................................... 7

    I.  Defendant Drug Enforcement Administration (DEA) ..................................... 7

    J.  Defendant Anne Milgram ............................................................................... 8

    K.  Defendant Houston Police Department (HPD) ................................................ 8

Facts ............................................................................................................................. 8

    A.  Franklin earned the money from sales of real estate ...................................... 12

    B.  TSA unlawfully seized, at the security check point, Franklin and his carry-on luggage which contained Franklin's cash, and involved DHS who seized Franklin and his luggage and cash at the boarding gate. ............................................................ 12

    C.  DHS seized Franklin, his carry-on luggage, his backpack, and his cash, and then DHS kept his cash for civil forfeiture ............................................................... 13

    D.  DHS still has Franklin's life savings. ............................................................. 15

    E.  Injuries to Franklin ........................................................................................ 16

    F.  Continuing and ongoing harm to Franklin from TSA's and DHS' airport personal seizure and cash seizure policies or practices ......................................... 17

TSA Allegations ............................................................................................................ 18

    A.   Nationwide examples of TSA Screeners following the challenged TSA personal seizure and cash seizure policy or practice ................................................................................... 25

DHS/DEA Allegations ................................................................................................................. 35

    A.   DHS and DEA's unconstitutional policy or practice of conducting suspicionless non-consensual seizures of air travelers based solely on the knowledge or belief that they are traveling with a "large" amount of cash ............................................................................ 37

    B.   DHS/DEA's unconstitutional policy or practice of seizing for civil forfeiture "large" amounts of cash from air travelers because DHS/DEA deem "large" amounts of cash presumptively subject to seizure ......................................................................................... 41

    C.   Nationwide examples of DEA agents following the challenged DHS and DEA airport personal seizure and cash seizure policies or practices ..................................................... 43

Claims ......................................................................................................................................... 51

    1.   Claim for *Ultra Vires* Agency Action Under 5 U.S.C. §§ 701-706 (Against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America) ........... 51

    2.   Claim for Unconstitutional Action Under 5 U.S.C. §§ 701-706 and the Fourth Amendment (Against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America) ..................................................................................................... 53

    3.   Claim for Unconstitutional Action Under 5 U.S.C. §§ 701-706 and the Fourth Amendment (Against DHS, DHS Secretary Mayorkas in his official capacity, and the United States of America) ..................................................................................................... 55

    4.   Claim Under Federal Rule of Criminal Procedure 41(g) and 28 U.S.C. § 1331 for Return of Plaintiff's Cash and Interest on Plaintiff's Property Seized and Held for Years in Violation of the Fourth Amendment (Against DHS, DHS Secretary Mayorkas, in his official capacity, and the United States of America) ....................................................................... 57

    5.   *Bivens* Claim for Compensatory Damages Under the Fourth Amendment (Against DHS Agent Terry Muise, DHS/HPD Officer Shoffner, and Houston Police Department) ......... 58

Request for Relief ....................................................................................................................... 59

Jury Demand ............................................................................................................................... 62

## **Introduction**

1.     Pending before Judge Lynn N. Hughes is Cause # 4:20-CV-01084, *United States v. $98,020.00*. Due to the legal fiction that the "In Rem" proceeding is against the cash, the cash is the "defendant." That legal fiction seems to require this case to be filed as an "original" action by the true party in interest who is the "claimant" in *U.S. v. $98,020.00*. This case should be filed and treated as a traditional crossclaim and counterclaim against the governmental actors, entities, policies, and procedures that have caused the illegal and unconstitutional violations complained of as set out herein.

2.     This civil rights lawsuit asks whether federal agencies may seize air travelers, their belongings, and/or their cash at U.S. airports without any indication of criminal activity, but simply because they are traveling with a "large" amount of cash. Plaintiff seeks to enjoin these unlawful and unconstitutional policies or practices of the Transportation Security Administration ("TSA") and the Department of Homeland Security ("DHS") and DEA, which violate the Fourth Amendment rights of thousands of air travelers each year.

3.     Plaintiff Robert Franklin seeks declaratory and injunctive relief from being subjected to TSA's and DHS's unlawful and unconstitutional personal seizure and cash seizure policies or practices at airports across the country.

4.     Plaintiff Robert Franklin also seeks (1) from DHS, the return of his seized cash, interest that accrued on his unconstitutionally seized cash that DHS withheld from him for at least twenty-four months and (2) compensatory damages caused by the unconstitutional cash seizure and the, at least, twenty-four months of unconstitutional deprivation of his money, and attorney fees.

5.     TSA has a policy or practice of seizing travelers, their property, and/or their cash at airports without reasonable suspicion or probable cause, based solely on the amount of cash they are traveling with or the amount of cash TSA believes they are traveling with. TSA's policy or

practice exceeds the agency's statutory authority—which is limited to transportation security and does not extend to investigating potential crimes unrelated to transportation security—and violates the Fourth Amendment.

6. DHS has policies or practices of (1) seizing travelers, their property, and/or their cash at airports without reasonable suspicion or probable cause, based solely on the presence or amount of cash DHS agents know or believe they are traveling with, and (2) seizing cash from travelers at airports for civil forfeiture without probable cause, based solely on the amount of cash DHS agents know or believe they are traveling with, which DHS deems presumptively subject to seizure at a certain threshold. DHS's policies or practices violate the Fourth Amendment.

## Jurisdiction

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367 and 5 U.S.C. § 701-706.

8. Plaintiff Franklin brings his statutory and Fourth Amendment claims under the Administrative Procedure Act, 5 U.S.C. § 701-706; the Declaratory Judgment Act, 28 U.S.C. §2201-2202; and the United States Constitution.

9. Plaintiff Franklin brings his individual claim for the return of seized property and compensatory damages under Federal Rule of Criminal Procedure 41(g) and this Court's general equity jurisdiction and under 28 U.S.C. § 1331.

10. Plaintiff Franklin brings his individual Fourth Amendment claim for compensatory damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

## Venue

11. Venue is proper in the United States District Court for the Southern District of Texas Houston Division under 28 U.S.C. § 1391(b)(2) and 1391(e)(1)(A) and Federal Rule of Criminal Procedure 41(g) because Defendants' unlawful and unconstitutional conduct occurred in the Southern District of Texas

**Parties**

**A. Plaintiff Robert Franklin**

12.    Plaintiff Robert Franklin is an adult citizen of the United States and is a resident of Groesbeck, Texas.

13.    Franklin has sole ownership of the $98,020 that DHS seized from Franklin at IAH while travelling to Medford, Oregon on November 13, 2019.

14.    Franklin brings three claims for declaratory and injunctive relief against the unlawful and unconstitutional seizures of cash, carry-on luggage, personal effects, and his person by TSA and/or DHS and DEA.

**B. Defendant United States of America**

15.    Defendant United States of America is the national federal government established by the United States Constitution. As such, it is subject to limitations imposed by the Constitution— including, as relevant here, the Fourth Amendment.

16.    The constitutional violations at issue here involve the actions of federal agencies and employees and are therefore ultimately chargeable to the federal government itself.

**C. Defendant Department of Homeland Security (DHS)**

17.    DHS is a federal agency whose primary mission includes monitoring and attempting to interdict connections between illegal drug trafficking and terrorism. 6 U.S.C. §111.

18.    In addition to DHS agents who are exclusively federal employees, DHS includes DHS Task Force Officers, who are federal, state and local law enforcement officers cross sworn as Title 6 DHS agents.

19.    A substantial portion of DHS' activities involve the seizure of cash that DHS agents, including DHS Task Force Officers, justify by unsubstantiated references to controlled substances, including at airports across the country.

20.     DHS follows a policy or practice of seizing air travelers and their possessions at U.S. airports without reasonable suspicion, based solely on the presence or amount of cash DHS agents know or believe they are traveling with.

21.     DHS follows a policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture, based solely on the presence or amount of cash DHS agents know or believe they are traveling with, which DHS deems presumptively subject to seizure.

22.     DHS follows a policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture, based solely on the fact that DHS agents know or believe they are traveling with $5,000 or more, which DHS deems presumptively subject to seizure.

23.     DHS engaged in these policies or practices in Plaintiff's case.

**D.  Defendant Alejandro Mayorkas**

24.     Defendant Mayorkas is the current Secretary of DHS.

25.     As Secretary of DHS, Mayorkas is responsible for overseeing the operations of DHS, including the policy or practice at issue here.

26.     Mayorkas is sued in his official capacity.

**E.  Defendant Terry Muise**

27.     Defendant Muise is a Special Agent of the Homeland Security Investigations division of DHS.

28.     Muise is the agent who seized Franklin and his possessions without reasonable suspicion and then seized Franklin's cash for civil forfeiture without probable cause on November 13, 2019.

29.     Defendant Muise's actions in seizing Franklin and his property without reasonable suspicion and in seizing Franklin's cash for civil forfeiture without probable cause were in accordance the DHS interdiction policies or practices that Franklin seeks to declare unlawful and enjoin in this lawsuit. The constitutional violations at issue are standard DHS practice(as illustrated

herein), but upon information and belief, no written DHS policy required Defendant Muise to commit these constitutional violations.

30. Defendant Muise is sued in his individual capacity pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

### F. Defendant Mark Shoffner

31. Defendant Mark Shoffner is a Task Force Officer for the Homeland Security Investigations division of DHS and Police Officer of the Houston Police Department.

32. Shoffner is the agent who seized and interrogated Franklin with Defendant Muise.

33. Shoffner is sued in his individual capacity.

### G. Defendant Transportation Security Administration (TSA)

34. TSA is a federal agency charged with protecting the nation's transportation systems, particularly air travel. 49 U.S.C. § 114(d)-(e).

35. TSA is not a general law enforcement agency. Most of its employees are not law enforcement officers and do not have general law enforcement authority or duties.

36. Pursuant to its statutory mandate, TSA conducts transportation security screenings of passengers and their luggage at U.S. airports. *See* 49 U.S.C. §§ 114(e), 44901.

37. TSA must promulgate regulations requiring air carriers to refuse to transport a passenger or their luggage if the passenger "does not consent to a search under section 44901(a) of this title establishing whether the passenger is carrying unlawfully a dangerous weapon, explosive, or other destructive substance" or if the passenger "does not consent to a search of the property establishing whether the property unlawfully contains a dangerous weapon, explosive, or other destructive substance." 49 U.S.C. § 44902(a)(1)-(2).

38. TSA conducts the transportation security screenings described in 49 U.S.C. § 44902(a).

39. Pursuant to its statutory mandates, TSA's authority to conduct transportation security

screenings is limited to "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5.

40.     TSA employees who conduct these transportation security screenings at airports ("TSA Screeners") include Transportation Security Officers and Supervisory Transportation Security Officers.

41.     TSA Screeners are not law enforcement officers, do not have general law enforcement authority or duties, and are not permitted to engage in general law enforcement investigations.

42.     Transportation security screenings at airport checkpoints by TSA Screeners are administrative searches conducted for the limited purpose of ensuring transportation security. They are not, by law, searches conducted for general law enforcement purposes.

43.     In contravention of this limited authority and duties, TSA Screeners follow a TSA policy or practice of seizing, or arranging with DHS the seizure of, travelers' cash, carry-on luggage, personal effects, and/or persons *after* TSA screeners have concluded the transportation security screening and determined that no items that pose a threat to transportation security are present.

44.     TSA Screeners base these seizures on whether the traveler appears to be traveling with a "large" amount of cash.

45.     What TSA Screeners consider to be a "large" amount of cash may vary, but is usually approximately $10,000 or more, or what appears to TSA Screeners to be approximately $10,000 or more, based on visual inspection or the X-Ray image of carry-on luggage.

46.     TSA Screeners make, or arrange with DHS, these post-screening seizures without regard for whether reasonable suspicion or probable cause exists for the seizures.

47.     TSA Screeners make, or arrange with DHS, these post-screening seizures to gather information regarding travelers with cash and their cash amounts that TSA Screeners pass on to law enforcement officers, including DHS agents.

48.     TSA Screeners also make, or arrange with DHS, these post-screening seizures in order to hold the traveler's cash, carry-on luggage, personal effects, and/or person until law enforcement officers, including DHS agents, can arrive at the transportation security screening area or boarding gate and continue to seize and interrogate travelers based solely on the presence or amount of cash that TSA Screeners inform them the person is traveling with.

49.     TSA has been engaging in this policy or practice for the entirety of the period described in Plaintiff's action.

50.     Pursuant to this policy or practice, TSA arranged the seizure of Franklin's cash, Franklin's carry-on luggage and its contents, Franklin's ID and boarding passes, and Franklin himself on November 13, 2019.

**H.  Defendant David P. Pekoske**

51.     Defendant Pekoske is the current Administrator of TSA.

52.     As Administrator of TSA, Pekoske is responsible for overseeing the operations of TSA, including the policy or practice at issue here.

53.     Pekoske is sued in his official capacity

**I.   Defendant Drug Enforcement Administration (DEA)**

54.     DEA is a federal agency charged with enforcing the controlled substances laws and regulations in the United States. 21 U.S.C. § 878.

55.     A substantial portion of DEA's activities involve the seizure of currency that it believes is connected to controlled substances, including at airports across the country. DEA routinely participates in interdiction task forces at airports in concert with DHS and TSA.

56.     Upon information and belief, DEA follows a policy or practice of seizing currency from travelers at U.S. airports without probable cause, based solely on the presence of currency of $5,000 or more on their person or in their carry-on luggage.

57.     Upon information and belief, after seizing currency from air travelers in this manner, DEA typically attempts to initiate the civil forfeiture of the property under the Civil Asset Forfeiture Reform Act (CAFRA). Money, so forfeited, is shared between participating government entities like TSA employees, D.H.S. and state on local law enforcement.

**J.  Defendant Anne Milgram**

58.   Defendant Milgram is the current Administrator of the DEA.

59.   As Administrator of DEA, Milgram is responsible for overseeing the operations of DEA, including the policy or practice at issue here.

60.   Milgram is sued in her official capacity

**K.  Defendant Houston Police Department (HPD)**

61.     Defendant Houston Police Department furnishes their officers, such as defendant Mark Shoffner, to participate in the DHS Task Force in exchange for a share of the ill-gotten seized, forfeited money.

62.     All of claims and relief requested against DHS also applies to the DEA, HPD and TSA.

**<u>Facts</u>**

63.   Franklin is a resident of Groesbeck, Texas.

64.   Franklin and his mother, Doris, lived together at 144 LCR 423, Groesbeck, Texas from early 2016 until her death on September 19, 2019.

65.   Franklin dedicated his time to providing full-time, in home care for Doris.

66.   Franklin picked up odd jobs for extra money and had been saving money he made doing so since about 2004. In 2016 and 2018 Franklin sold real property for approximately $97,661.23 and $44,159.87.

67.   When his mother passed away in 2019, Franklin planned to start a new life and move to

Oregon.

68. Franklin purchased a flight from Houston, Texas to Medford, Oregon with the intention of purchasing property that would be suitable for his new life and future business ventures.

69. Knowing he intended to buy property and that he would be carrying a substantial amount of cash, Franklin decided to fly instead of drive to ensure a more secure trip.

70. Franklin had obtained money years before, including, through the sale of property in 2018 in Thornton, Texas, and in 2016 in Burnet, Texas.

71. On November 13, 2019, before even boarding his plane at George Bush Intercontinental Airport (IAH), his trip was cut short by the Transportation Security Administration ("TSA") and Department of Homeland Security ("DHS"). While his carry-on bag went through the x-ray machines required by airport security, TSA agents noticed cash in the carry-on. They pulled his carry-on and backpack to the side and asked Franklin if they could look through them. Franklin said yes and they opened them and saw the cash. Then they asked if they could go in another room for privacy and Franklin said yes. Franklin acknowledged and explained the money, and TSA let him proceed to his gate. The TSA Screener had inspected Franklin's carry-on luggage and found no weapons, explosives, incendiaries, or other prohibited items, and the TSA Screener's questions about the amount of, and purpose for, the cash were not relevant to any transportation security concern.

72. TSA notified DHS Task Force Officer Terry Muise ("Muise") that Franklin was travelling with a large amount of currency from Houston, Texas to Los Angeles, California. Based on that, Muise and DHS Task Force Officer Mark Shoffner ("Shoffner") approached Franklin at his departure gate. Muise asked if he could talk to Franklin who said yes. Then Muise asked to search Franklin's suitcase, and Franklin asked why. Muise said that he found it unusual for someone to travel with such a large quantity of money. Franklin explained that he was planning on purchasing

a property in Oregon. Muise asked if he could prove where he got the money. Franklin explained that the money came from the sale of property and showed Musie paperwork from one of the purchases. Muise asked if Franklin would be willing to open his carry-on said. Franklin asked if he was under arrest or being detained, and Muise said no. Franklin did not feel free to leave. Believing that this was a secondary TSA type search, and knowing it was not against the law to travel with money, Franklin did so and revealed some of the clothes and money that he was travelling with. Muise alleges that he smelled an "unusual aroma emanating from the bag," which he says he associated with narcotics couriers based on his training and experience. Franklin denies any aroma from his bag.

73.   Muise then asked Houston Police Department Canine Officer Steven Fisher ("Fisher") to come to the gate with his K9 Partner "Lola." Franklin reasonably believed he was being detained. Even if DHS agents had told him he was free to leave, he could not realistically have left his carry-on luggage with all his cash and clothing before going to a new state. DHS seized Franklin along with his carry-on luggage and cash. The DHS's seizure of Franklin and his belongings exceeded TSA and DHS's authority and was unconstitutional. Franklin did not feel free to walk away from the DHS agent or to decline to answer the DHS agent's questions about his cash. Rather than permit Franklin to continue to board at his gate, the DHS agents unlawfully prolonged his detention beyond the administrative search of Franklin and his carry-on luggage by detaining Franklin and his belongings and questioning him about why he was traveling with cash, a topic that was not relevant to any transportation security concerns. Shoffner asked Franklin if Franklin could show any evidence of property he intended to buy in Oregon, but Franklin said he could not because he was going to search when he arrived in Oregon, where he would stay with a friend in the meantime.

74.   When Fisher arrived with Lola, Fisher had Lola walk and sniff around and near Franklin's belongings. Lola wandered around for a little while before allegedly "alerting" to a scent of illegal

narcotics on Franklin's carry-on by sitting down near it. Franklin denies any noticeable "alert" by the dog. Muise then seized Franklin's suitcase and backpack with Franklin's clothing and money and told Franklin that Franklin could leave if he wanted to but would have to go with the officers to their airport office if he wanted a receipt for his property. Franklin said he would not leave without his belongings. Muise advised the boarding agent to cancel Franklin's boarding pass because, "he is not going anywhere".

75. Muise gave Franklin a form or receipt that said "cash" and did not specify the amount of currency. Muise then told Franklin that he was going to apply for a search warrant to search Franklin's suitcase. Franklin did not want to leave without them counting it and providing a receipt with the specific amount of money. In order to get an accurate receipt and not have to wait around the whole day for a warrant, Franklin "consented" to a search of his suitcase and backpack.

76. No illegal contraband was found on Franklin's person or his belongings. Not only was the money earned legitimately by Franklin, but Franklin has no criminal history that would lead the agents to believe that the money was derived from the dealing of illegal substances or intended for same. DHS seized $48,020 in U.S. currency from Franklin's suitcase and $50,000 in U.S. currency from Franklin's backpack. A total of $98,020.00.

77. DHS seized for civil forfeiture Franklin's life savings without probable cause.

78. Franklin has not been arrested for or charged with any crime. Nor was he accused of any crime. Once the DHS agents seized his cash for civil forfeiture, the DHS agents told Franklin he was free to leave.

79. DHS's initial seizure and continued retention of Franklin's life savings for at least twenty-four months (to date) prevented him from paying for his property and paying for other expenses for those years.

80. After these events, as a result of his knowledge of TSA's and DHS's airport personal

seizure and cash seizure policies or practices, Franklin has refrained and will refrain from the entirely lawful conduct of flying commercially with "large" amounts of cash. Franklin has significantly changed his business behavior when buying or purchasing property or just traveling.

81. Now, years after the seizure, DHS has not returned any of the $98,020 that they seized from Franklin on November 13, 2019

82. Plaintiff Robert Franklin brings this action to recover his property and end these unlawful and unconstitutional airport personal seizure and cash seizure policies or practices.

**A. Franklin earned the money from sales of real estate**

83. Franklin sold 40 acres in Burnet County to Allan Snider on June 6, 2016.

84. Franklin sold 7.5 acres in Limestone County to Lewis Z. Rodriguez and Irma Torres Rodriguez on May 21, 2018.

**B. TSA unlawfully seized, at the security check point, Franklin and his carry-on luggage which contained Franklin's cash, and involved DHS who seized Franklin and his luggage and cash at the boarding gate.**

85. While going through the transportation security screening checkpoint, Franklin behaved normally, in a similar manner to other air travelers going through the security screening, and did nothing unusual, suspicious, indicative of criminal activity, or indicative of any threat to transportation security.

86. A TSA Screener saw the cash in the X-Ray image of Franklin's carry-on luggage.

87. After the TSA Screeners pulled aside Franklin's carry-on luggage, a TSA Screener questioned Franklin about the amount and purpose of the cash inside. TSA had already completed the transportation security screening when the TSA Screener began interrogating Franklin about his cash. The TSA Screener's questions about the amount and purpose of the cash were not relevant to any transportation security concern.

88. As determined by TSA's transportation security screening, Franklin had no items that

could threaten transportation security—weapons, explosives, incendiaries, or other prohibited items—in his luggage or on his person. The mere presence of the cash in Franklin's carry-on luggage was the only reason that the TSA Screeners interrogated him. Franklin explained his innocent reasons for having cash.

89. Showing that TSA still had no safety concerns, TSA allowed Franklin through the checkpoint and on to his departure gate.

90. Based solely on the presence of the cash in Franklin's carry-on luggage, TSA Screeners notified DHS.

91. Despite these delays, Franklin made it to the boarding gate for his departing flight with time to spare and sat in a nearby seat. He continued to behave normally, in a similar manner to other air travelers, and did nothing unusual, suspicious, indicative of criminal activity, or indicative of any threat to transportation security.

**C. DHS seized Franklin, his carry-on luggage, his backpack, and his cash, and then DHS kept his cash for civil forfeiture**

92. But Franklin was soon approached at the gate by two strangers.

93. One of them identified himself as a Houston Police Officer. He was Defendant Mark Shoffner.

94. The other stranger was Defendant Terry Muise.

95. The sole reason that Defendant Muise approached Franklin and told Franklin he had some questions for him at the airport was because Muise knew Franklin was traveling with a "large" amount of cash. That alone is not reasonable suspicion for a seizure. Nor did any combination of information that Defendant Muise might have known at the time give rise to reasonable suspicion. Franklin was behaving normally and was simply working on his laptop and eating breakfast in a seat near his boarding gate, in a similar manner to other air travelers. He did nothing unusual, suspicious, indicative of criminal activity, or indicative of any threat to transportation security.

96. Despite the lack of any facts giving rise to reasonable suspicion, Franklin's encounter with Defendant Muise and the HPD officer at his gate was not a consensual interview. Defendant Muise approached Franklin in the high security setting of an airport, told Franklin that he was a federal law enforcement officer, and told him that he wanted to speak with him about the cash in his possession. Franklin did not feel free to walk away or to decline to answer in the face of these targeted questions by a federal law enforcement officer at the airport, particularly given the similarity of these questions to those asked of him at the transportation security screening checkpoint by TSA Screeners.

97. Continuing the suspicionless non-consensual seizure, Defendant Muise and Shoffner escorted him to a less crowded part of the gate area to question him. Franklin still felt like he had no choice but to comply with Defendant Muise's demands and to answer his questions.

98. From the start of the encounter, Franklin did not feel free to walk away from Defendant Muise or to decline to answer his questions. He also needed to remain near the gate in order to board his flight.

99. Defendant Muise told Franklin to show him the cash that he knew he had in his carry-on luggage. Franklin felt like he had no choice but to comply with the targeted demands and showed Muise the cash.

100. Defendant Muise's knowledge that Franklin was traveling with a "large" amount of cash was the sole basis for Defendant Muise's suspicionless non-consensual seizure of Franklin—including escorting him to a different area, questioning him about the cash, and demanding to see the cash. This was in accordance with DHS' policy or practice of seizing travelers at airports without reasonable suspicion, based solely on the presence or amount of cash DHS agents know or believe they are traveling with.

101. Upon information and belief, Defendant Muise intended to seize Franklin's cash as soon

as he learned of the amount. This was in accordance with DHS's policy or practice of

102. Presumptively seizing cash totaling $5,000 or more from travelers at U.S. airports for civil forfeiture regardless of whether there is probable cause for the seizure.

103. Defendant Muise interrogated Franklin, asking why he was traveling with the cash. After explaining, Defendant Muise asked to look inside Franklin's bag. Franklin attempted to assert his rights by asking why and asking if travelling with cash was against the law. Muise said it was not against the law but that he found it suspicious and explained what he believed to be his duties. Franklin acquiesced and allowed Muise to look inside his luggage, where Muise saw Franklin's clothing and cash.

104. Defendant Muise saw no contraband or suggestion of criminality. Despite this, Defendant Muise called for a K9 to conduct a sniff around Franklin.

105. When the K9 arrived, the K9 allegedly alerted that the scent of illegal drugs was at the area where Franklin's luggage was. No drugs were found. No "alert" was evident to Franklin.

106. Muise then told Franklin that his belongings would be detained while he applied for a search warrant to search his luggage and backpack. Muise suggested Franklin should sign a "consent" to search to speed up the resolution of the matter. Franklin signed.

107. Defendant Muise seized all of Franklin's cash, totaling $98,020.00 in cash.

108. Franklin's cash was seized for civil forfeiture without probable cause.

109. At the time of Franklin's non-consensual seizures by TSA, DHS, and HPD, the non-consensual seizure of his possessions and seizure of his cash for civil forfeiture by DHS, Franklin was not under investigation for any criminal activity. Franklin was seized by TSA, HPD, and DHS based solely on the presence or amount of cash he was known or believed to be traveling with.

**D.  DHS still has Franklin's life savings.**

110. Franklin was not arrested or charged with any crime. He was free to walk away from

Defendant Muise as soon as (but not before) Muise took Franklin's life savings. He was not permitted to board his flight to Oregon. He was deeply embarrassed by his fellow passengers and other onlookers staring at him during this entire non-consensual encounter because it appeared he had done something wrong or illegal.

111. Franklin was not allowed to board his flight

112. Franklin has not been arrested for or charged with any crime related to or arising from any circumstances surrounding the seizure of his cash.

113. Franklin received a notice from DHS for the seized $98,020 indicating DHS' intention to permanently keep his cash through civil forfeiture.

114. Franklin timely filed claims with DHS, demanding that the government initiate judicial forfeiture proceedings in federal court but has not received his seized property.

115. Franklin was unconstitutionally deprived of his $98,020 by DHS for at least two years so far and was not able to purchase his home or pursue his business endeavors. All of this happened to Franklin even though he was not under investigation for, and did not commit, any crime. It is not a crime to travel with any amount of cash, traveling with any amount of cash does not give rise to reasonable suspicion or probable cause, and there are no legal requirements to report to the government that one is traveling domestically with any amount of cash.

### E. Injuries to Franklin

116. Franklin has a sole ownership interest in the $98,020.00 in cash that Defendants seized and that DHS sought to forfeit. Franklin has suffered the loss of use and interest that accrued on that seized cash for the years it has been retained by DHS and wrongfully withheld from Franklin.

117. Franklin also has a possessory interest in the seized cash.

118. TSA and DHS' ultra vires and unconstitutional seizure of Franklin's cash, carry-on luggage, and himself after the transportation security screening had concluded constituted a seizure

of Franklin and violated his Fourth Amendment right to be free from unreasonable seizures.

119. DHS' unconstitutional seizure of Franklin and his property based on the fact that he was traveling with a large amount of cash violated and continues to violate his Fourth Amendment right to be free from unreasonable seizures. Franklin seeks the vindication of those rights.

120. Franklin's inability to use the seized money for years has resulted in ongoing pain and suffering to Franklin, including but not limited to Franklin's inability to pay for his house and business endeavors.

121. Franklin suffered from the ongoing deprivation of the enjoyment and use of his life savings for years, materially impacting his quality of life. But for the seizure of the cash, Franklin would have spent some of the money to buy a home in Oregon, and he would have spent some of the money on other expenses that would improve Franklin's quality of life, such as health care.

122. Franklin has incurred reasonable and necessary attorney fees as a result of Defendants' illegal and unconstitutional acts.

123. Franklin suffered and continues to suffer emotional distress, pain, and suffering caused by the ongoing deprivation of his and his life savings.

124. Franklin suffered and continues to suffer emotional distress, pain, and suffering caused by the insult and humiliation of the circumstances and manner of the unlawful seizure.

**F. Continuing and ongoing harm to Franklin from TSA's and DHS' airport personal seizure and cash seizure policies or practices**

125. Franklin is suffering the continuing, present adverse effects of TSA's and DHS' ultra vires and unconstitutional policies or practices. As a result of Defendants' ongoing policies or practices, Franklin has refrained and will refrain from the entirely lawful conduct of flying commercially with "large" amounts of cash.

126. Thus, as a result of Defendants' ongoing policies or practices, Franklin has been deprived of his preferred way of travelling to find a better quality of life or business venture in another state.

127. Until Defendants' airport cash seizure policies or practices are ended, Franklin will, quite reasonably, not fly commercially with "large" amounts of cash and will have to use time-consuming, inconvenient, and costly methods to pursue his economic efforts.

## TSA Allegations

128. Congress gave TSA statutory authority to operate under 49 U.S.C. § 114, which makes the agency "responsible for security in all modes of transportation." 49 U.S.C. § 114(d). This includes the authority to conduct air transportation security screening operations. 49 U.S.C. § 114(e). TSA is statutorily charged with developing "policies, strategies, and plans for dealing with threats to transportation security." 49 U.S.C. § 114(f)(3).

129. TSA's authority over air transportation security is set forth in 49 U.S.C. § 44903.

130. TSA's authority to screen passengers and property is set forth in 49 U.S.C. § 44901.

131. TSA's statutory authority is so narrowly limited to these purposes that Congress felt it was necessary to specifically authorize TSA to keep loose change and other money that is incidentally left behind at transportation security screening checkpoints. See 49 U.S.C. § 44945.

132. Transportation security screenings at airport checkpoints by TSA Screeners are administrative searches conducted for the limited purpose of ensuring transportation security. They are not, by law, searches conducted for general law enforcement purposes.

133. TSA's screening procedures are designed to assess whether air passengers or their luggage are a threat to transportation security by screening for dangerous items.

134. The scope of TSA transportation security screenings is limited to "the inspection of individuals and property for weapons, explosives, and incendiaries." 49 C.F.R. § 1540.5; see also 49 U.S.C. § 44902.

135. Air travelers "may not have a weapon, explosive, or incendiary, on or about the individual's person or accessible property." 49 C.F.R. § 1540.111.

136. A weapon, explosive, or incendiary is specifically defined by TSA in an exhaustive list at 70 Fed. Reg. 9878 (Mar. 1, 2005), https://www.govinfo.gov/content/pkg/FR-2005-03-01/pdf/05-3977.pdf. TSA's exhaustive list of defined weapons, explosives, or incendiaries does not include "cash," "currency," or "money."

137. Once TSA Screeners have determined that none of the defined prohibited items are present and that the traveler, their carry-on luggage, and their personal effects do not present a threat to transportation security, the transportation security screening has concluded, and TSA Screeners do not have authority to further detain the traveler, their carry-on luggage, or their personal effects.

138. Cash is not a weapon.

139. Cash is not an explosive.

140. Cash is not an incendiary.

141. Cash is not a threat to transportation security or air travel safety.

142. Air travelers with large amounts of cash do not, on that basis, present any threat to transportation security or air travel safety.

143. No statute or regulation identifies "cash" or "currency" as a threat to transportation security or air travel safety.

144. No statute or regulation identifies "cash" or "currency" as a dangerous or prohibited item for air travelers.

145. TSA provides an online list of items which are, or are not, prohibited. See Transportation Security Administration, What Can I Bring? https://www.tsa.gov/travel/security-screening/whatcanibring/all-list (last visited July 17, 2020). There are currently 459 items on the list.

146. Nowhere on this list of 459 items are "cash," "currency," or "money" mentioned, let alone identified as prohibited items.

147. TSA Management Directive No. 100.4 (Sept. 1, 2009) and TSA Operations Directive 400-54-6 (Oct. 29, 2009) are agency policies that purport to provide binding guidance to TSA Screeners

regarding their statutory and regulatory authority and duties with respect to the detection of cash or currency at transportation security screening checkpoints.

148. TSA admits that "[t]raveling with large amounts of currency is not illegal," and that the only relevance of cash or currency to transportation security screenings is that "[l]arge amounts of currency ('bulk currency') can . . . conceal a weapon, explosives, or other items that may pose a threat to transportation security." TSA Operations Directive 400-54-6 (Oct. 29, 2009).

149. Accordingly, "large quantities of currency discovered at the checkpoint, either on a person or in accessible property, may need closer examination to ensure prohibited items are not secreted and to clear the person or property to enter the sterile area." TSA Operations Directive 400-54-6 (Oct. 29, 2009).

150. If that additional screening is completed uneventfully and no prohibited items are discovered, the transportation security screening has concluded and the traveler is free to enter the sterile (secured) area of the airport.

151. TSA also admits that "[s]creening may not be conducted to detect evidence of crimes unrelated to transportation security." TSA Management Directive No. 100.4 (Sept. 1, 2009).

152. Neither TSA Management Directive No. 100.4 (Sept. 1, 2009) nor TSA Operations Directive 400-54-6 (Oct. 29, 2009) purports to expand TSA Screeners' authority or duties beyond their statutory and regulatory bounds—i.e., administrative screenings limited to threats to transportation security.

153. Indeed, no TSA directive could expand TSA Screeners' authority or duties beyond their statutory and regulatory bounds.

154. TSA Screeners have no statutory authority to seize people or property beyond the duration of the administrative transportation security screening based on the presence of cash.

155. TSA Screeners also do not have statutory authority to seize other items that do not pose a

threat to transportation security, including potential contraband or potential evidence of a crime unrelated to transportation security.

156. Because of the limits of their statutory authority, if TSA Screeners encounter potential contraband or potential evidence of a crime unrelated to transportation security, they are supposed to notify law enforcement personnel rather than seize the property or personally investigate.

157. TSA Operations Directive 400-54-2 incorrectly identified "Large amounts of cash ($10,000)" as an example of "contraband" that should be referred to local law enforcement officers.

158. The Operations Directive that replaced it, OD-400-54-6, also identifies non- transportation security related procedures when TSA Screeners encounter a traveler with more than $10,000: "When a TSO performing routine security screening finds currency that appears to be in excess of $10,000, the TSO should notify the STSO." Significant portions of the next two sentences of OD-500-54-6 are redacted in the publicly available version obtained under FOIA, but it appears to direct that, in such circumstances, "the STSO should notify local law enforcement authorities and CBP."

159. Operations Directive 400-54-6 also identifies non-transportation security related procedures when TSA Screeners encounter an air traveler with "a large amount of cash that may be related to criminal activity." Significant portions of this sentence and the next sentence of OD- 500-54-6 are redacted in the publicly available version obtained under FOIA, but it appears to direct that, in such circumstances: "the STSO, local law enforcement authorities, and the [REDACTED] must be notified." The first and primary factor identified by OD-500-54-6 as "indicating that currency may be related to criminal activity" is the "quantity" of currency.

160. Similarly, TSA's Screening Management Standard Operating Procedures specify that supervisor transportation security officers "must" do the following: "Conduct the procedures for checking travel documents and notifying the LEO and the U.S. Customs and Border Protection (CBP), when applicable, when U.S. currency or other monetary instruments appearing to exceed

$10,000 is found on an individual or their property during screening."

161. Though not instructed or authorized to do so by these written policies, TSA Screeners frequently detain travelers or their luggage while notifying law enforcement officers about the presence of a "large" amount of cash—typically but not always amounts of $10,000 or more—on a traveler's person or in their luggage and question them while waiting for the law enforcement officers to arrive and take custody of the traveler or their possessions at the transportation security screening area.

162. In addition, TSA's Screening of Passengers by Observation Technique ("SPOT") Referral Report Form instructs TSA Screeners that travelers who have a "Large sum of monies with no apparent reason to possess" should receive an "Automatic LEO Notification," meaning that TSA Screeners should alert law enforcement officers in such situations.

163. Though not instructed or authorized to do so by this written policy, TSA Screeners frequently detain travelers or their luggage while waiting for law enforcement to arrive in these circumstances. TSA screeners also determine the departure gate for the targeted traveler if not detained so DHS or other law enforcement can detain the traveler at the gate.

164. As recognized by the DHS Office of Inspector General, "the SPOT program has not defined how [cash- or currency-related] outputs support achieving the SPOT program goals," which are to "identify high-risk individuals who may pose a threat to transportation security." To this end, cash- or currency-related searches and seizures "do not provide a measure of program effectiveness." DHS Office of Inspector General, *Transportation Security Administration's Screening of Passengers by Observation Techniques* (Redacted) at 6 (May 2013), https://www.oig.dhs.gov/sites/default/files/assets/Mgmt/2013/OIG_13-91_May13.pdf.

165. In contravention of its statutory and regulatory bounds, TSA Screeners follow a TSA policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons after

TSA has determined that no items that pose a threat to transportation security are present and the transportation security screening has concluded.

166. As part of this TSA policy or practice, TSA Screeners regularly prolong or extend the detention of travelers beyond the administrative search of travelers for transportation security screening purposes in order to investigate matters that are unrelated to transportation security, such as to conduct investigations into travelers with "large" amounts of cash.

167. TSA follows this policy or practice based on the presence of what TSA Screeners consider "large" amounts of cash on travelers or in their carry-on luggage. But traveling with "large" amounts of cash is not illegal, and an air traveler's mere possession of "large" amounts of cash, by itself, does not give rise to reasonable suspicion of a crime, let alone indicate any threat to transportation security.

168. Upon information and belief, these TSA seizures of travelers' cash, carry-on luggage, personal effects, and/or persons, while temporary, can sometimes last from several minutes to more than 30 minutes after the transportation security screening is complete.

169. During this time, TSA Screeners may tell travelers that they are free to leave, but as a practical matter, travelers may not leave without their seized cash, carry-on luggage, and/or personal effects.

170. Despite the clear limitations on its statutory authority, as recently as 2009, TSA openly acknowledged that TSA Screeners regularly questioned travelers about why they were traveling with cash and conducted law enforcement investigations, requiring passengers to "account for the money" they traveled with.

171. On March 29, 2009, traveler Steven Bierfeldt and his possessions were seized by TSA Screeners, and he was detained and questioned by TSA Screeners at the St. Louis Lambert International Airport (STL) because he was traveling with approximately $4,700 in cash. The TSA

Screeners took him to a private interrogation room and questioned him for approximately 30 minutes. An audio recording of the encounter revealed the TSA Screeners repeatedly threatening to turn him over to the DEA or FBI or to "take him down to the station" if he did not answer their questions. The money Bierfeldt had with him was entirely lawfully obtained funds belonging to a political organization, the Campaign for Liberty, and TSA Screeners had no basis to suspect otherwise.

172. In response to news about Bierfeldt's treatment by TSA Screeners at STL, TSA posted the following statement on its official website on April 3, 2009: "Movements of large amounts of cash through the checkpoint may be investigated by law enforcement authorities if criminal activity is suspected. As a general rule, passengers are required to cooperate with the screening process. Cooperation may involve answering questions about their property, including why they are carrying a large sum of cash."

173. In further response to backlash against the April 3, 2009 post and continued news about Bierfeldt's treatment by TSA Screeners at STL, on April 14, 2009, TSA's Chief Counsel admitted on TSA's official website that it is standard practice for TSA Screeners to "ask a passenger who is carrying a large sum of cash to account for the money." She further stated that the agency viewed detecting "signs of criminal activity" as one of the principal duties of TSA Screeners along with "reacting to potential security problems." She further admitted that TSA screeners wildly exceed their authority to screen passengers for transportation security: "When presented with a passenger carrying a large sum of money through the screening checkpoint, the TSA officer will frequently engage in dialog with the passenger to determine whether a referral to law enforcement authorities is warranted. The TSA officer may consider all circumstances in making the assessment, including the behavior and credibility of the passenger."

174. In June 2009, Bierfeldt sued then-Secretary of Homeland Security Janet Napolitano for

TSA's violation of his Fourth Amendment rights, pointing out that TSA was also exceeding its statutory authority with policies that directed TSA Screeners to conduct law enforcement investigations rather than limit their searches of travelers and their luggage to transportation security purposes.

175. In response to Bierfeldt's lawsuit, TSA issued two new directives related to screening operations, TSA Management Directive No. 100.4 (Sept. 1, 2009) and TSA Operations Directive 400-54-6 (Oct. 29, 2009). These directives purport to limit TSA Screeners' behavior to that authorized by statute and permitted by the Fourth Amendment. Bierfeldt dismissed his lawsuit without any judicial determinations regarding any of TSA's policies or practices.

176. Neither TSA Management Directive No. 100.4 (Sept. 1, 2009) nor TSA Operations Directive 400-54-6 (Oct. 29, 2009) purports to give TSA Screeners the authority to conduct the ultra vires and unconstitutional seizures described in this complaint.

177. Unfortunately, despite the existence of these directives, TSA Screeners continue to conduct the same unlawful and unconstitutional actions that led to the Bierfeldt lawsuit: for no transportation security objectives and based solely on the presence or amount of cash, TSA continues to seize "large" amounts of cash and continues to question, investigate, and seize travelers with "large" amounts of cash. Upon information and belief, TSA Screeners conduct these ultra vires and unconstitutional seizures pursuant to an unwritten policy or practice, or pursuant to some other non-public written policy, as demonstrated by the examples cited herein.

### A. Nationwide examples of TSA Screeners following the challenged TSA personal seizure and cash seizure policy or practice

178. Franklin's experience is just one example of TSA's personal seizure and cash seizure policy or practice. The following are more examples that demonstrate TSA's challenged policy or practice on an ongoing national scale.

179. On or about February 25, 2020, Kamal Hawkins was traveling from the Raleigh-Durham

International Airport (RDU) in North Carolina to his home in Los Angeles, California with approximately $26,000 in cash in his luggage. The cash was his life earnings, including money he earned from his production and clothing businesses, as well as financial aid he recently received for college. When Mr. Hawkins went through the transportation security screening checkpoint, a TSA Screener pulled his bag aside and went through it, finding some of the cash in a pants pocket. When Mr. Hawkins explained that more of his money was in the bag, the TSA Screener said, "Hold on right here" and summoned other TSA Screeners to the scene. The TSA Screeners told Mr. Hawkins that they needed to take him to an interrogation room "in the back" to investigate his cash. One TSA Screener told Mr. Hawkins he could walk away, but not with his luggage or his life earnings and education funds. He had no choice but to submit to the TSA Screeners' backroom interrogation— which was not based on any findings of weapons, explosives, incendiaries, or other prohibited items, but was based solely on presence or amount of cash that Mr. Hawkins was traveling with. The TSA Screeners took Mr. Hawkins to a private interrogation room and began asking questions about the cash and inspecting the various business and financial documents he provided. They held Mr. Hawkins, his luggage, and his life earnings for approximately 10-15 minutes until RDU airport police arrived to continue the law enforcement interrogation.

180. On September 20, 2019, Boris Nulman was departing from the Tampa International Airport (TPA) in Florida for Cleveland, Ohio with at least $181,500 in cash to purchase one or more pre-owned tractor trailer trucks as a purchasing agent for FGL Transport, Inc., a licensed trucking company. As Mr. Nulman went through the transportation security screening checkpoint with the cash in his carry-on bag, TSA Screeners pulled aside his bag solely because they observed the cash in the X-Ray scan of his bag. The TSA Screeners told Mr. Nulman that they were going to hold on to his cash and carry-on luggage until law enforcement officers arrived. Mr. Nulman reasonably believed he was being detained by the TSA Screeners and did not feel free to leave. Even if he had

been told he was free to leave, it would not have been practical or reasonable for him to leave the transportation security screening area without his carry-on luggage or the cash, so he was effectively seized along with his carry-on luggage and the cash. Mr. Nulman had no weapons, explosives, illegal drugs, or other contraband in his luggage or on his person.

181. On November 13, 2018, at the Eugene Airport (EUG) in Oregon, TSA seized an adult male domestic air traveler and his possessions solely because he was traveling with $100,000 in cash from a business he had just sold. The traveler had the cash in his carry-on backpack. TSA Screeners pulled his backpack aside after they evidently saw the cash during the X-Ray screening. The traveler had no weapons, explosives, incendiaries or other prohibited items. After searching his backpack, TSA Screeners pulled him aside and walked him to a separate interrogation room, where they told him that somebody else had a few questions for him. He did not feel free to leave. He was then questioned by DEA agents, who seized the $100,000 in cash for civil forfeiture. After the traveler retained an attorney, all his seized money was eventually returned, but he had to pay one third of the recovered money to his attorney as a contingency fee.

182. On November 9, 2018, at approximately 10:00 a.m. local time, an adult male traveling through Phoenix Sky Harbor International Airport (PHX) in Arizona en route to Detroit, Michigan with more than $10,000 in cash on his person was pulled aside by TSA Screeners at the transportation security screening checkpoint and questioned for approximately 10-15 minutes about why he was traveling with what the TSA Screeners called a "suspicious" amount of cash. He informed the TSA Screeners that he was only traveling domestically, but they continued to question him about the cash, preventing him from proceeding to his gate for several minutes. He did not feel free to leave while this was happening. The traveler had no weapons, explosives, incendiaries, or other prohibited items, and the TSA Screeners did not mention any threats to transportation security—they were only interested in the cash. One of the TSA Screeners who questioned the air

traveler was TSA Transportation Security Manager Lori Barr, who gave the air traveler his contact card.

183. On June 11, 2018, TSA Screeners seized an adult male and his $30,000 in cash while he was traveling back to his home in Sacramento, California from Little Rock, Arkansas. He was returning from a business trip to buy used cars and had brought the cash to make on-the-spot purchases. When he went through transportation security screening at the Clinton National Airport (LIT) in Little Rock, a TSA Screener pulled aside his carry-on bag and searched it after claiming to have seen a "suspicious object" displayed on the X-Ray monitor. There were no weapons, explosives, incendiaries, or other prohibited items in his carry-on bag, but it contained the $30,000 in cash. Upon finding the money, the TSA Screener told the traveler that he would have to call a supervisor. The supervisor TSA Screener arrived and questioned the traveler about why he was traveling with so much money. The TSA Screeners made no mention of any threats to transportation security. The traveler believed he was not free to leave or walk away and that he had to answer the supervisor TSA Screener's questions. The supervisor TSA Screener detained the traveler and his carry-on bag until a law enforcement officer arrived at the scene and continued the detention based on the presence or amount of cash. The officer ultimately seized the cash for civil forfeiture. After the traveler filed a CAFRA claim demanding that the government pursue civil forfeiture, all of his money was returned approximately five to six months after the seizure.

184. On March 26, 2018, TSA Screeners seized Tom Hill and $62,000 in cash that he was traveling with at John F. Kennedy International Airport (JFK) in New York. Mr. Hill was traveling back to his home in Cedar City, Utah from a business trip to New York City to collect a cash payment from a client of his technology resale business. When Mr. Hill approached the transportation security screening checkpoint at JFK, he asked the TSA Screener for a private screening and said he was traveling with $62,000 in cash. The TSA Screener called a supervisor

TSA Screener. That supervisor did a secondary screening of his carry-on luggage, recorded Mr. Hill's information, photocopied his driver's license, took his business card, and asked questions about the cash. Mr. Hill did not feel free to leave while this was happening. The TSA Screeners did not mention any transportation security threats, and Mr. Hill had no weapons, explosives, incendiaries, or other prohibited items on his person or in his carry-on luggage. Mr. Hill was eventually released. At his departure gate, DEA agents approached and interrogated Mr. Hill based on their knowledge that he was traveling with a large amount of cash, and they seized his cash for civil forfeiture. A year later, after spending more than $10,000 in attorney's fees, all but $1,000 of the seized cash was returned ($1,000 went missing and DEA claimed they had only seized $61,000 from Mr. Hill).

185. Tom Hill had another similar experience with TSA Screeners seizing him and his cash at the Philadelphia International Airport (PHL) approximately one year earlier, in 2017, when he was traveling with about $60,000. When Mr. Hill approached the transportation security screening checkpoint at PHL, he notified the TSA Screeners that he had cash and asked to speak to a supervisor. The TSA Screeners directed him to a private room where they checked his bags and briefly detained him while they made a phone call. Mr. Hill did not feel free to leave while this was happening. The TSA Screeners eventually released him to catch his flight.

186. On or about February 14, 2017, TSA Screeners stopped and detained Charles Homan at the Baltimore/Washington International Airport (BWI) in Maryland after they discovered a "large" amount of cash in his carry-on luggage. The cash was the sole basis for the detention; the TSA Screeners made no mention of any potential transportation security threats.

187. On or about June 30, 2015, TSA Screeners seized a male air traveler and his $75,000 in cash in a carry-on bag at the transportation security screening checkpoint at the Richmond International Airport (RIC) in Virginia. TSA officers subsequently took a photo of the carry-on bag

and the cash, and a TSA employee tweeted the photo from Twitter account @TSAmedia_LisaF with the message: "If you had $75,000, is this how you'd transport it? Just asking! TSA @ #RIC spotted this traveler's preferred method." No mention was made of any transportation security threats. The passenger was permitted to board his flight, but WTVR news reported: "An airport spokesperson said the money was turned over to an unspecified federal agency."

188. On or about July 14, 2014, TSA Screeners at Newark Liberty International Airport (EWR) seized, questioned, and investigated Damon Rasbury at the transportation security screening checkpoint because he "was in possession of a large amount of United States currency in his carry-on luggage." TSA Screeners questioned Mr. Rasbury about whether there was any contraband in his luggage, searched his bag and found $5,000 in cash, asked him if there was any other cash in the luggage, and continued searching his luggage for more cash, with no evident transportation security purpose for this investigation.

189. In approximately 2013, TSA Screeners questioned software engineer Aaron Nabil-Eastlund about why he was traveling with "so much cash" at the transportation security screening checkpoint at the Portland International Airport (PDX) in Oregon. There was no evident transportation security purpose for the question and he had no weapons, explosives, incendiaries, or other prohibited items on his person or in his carry-on luggage. He was traveling with approximately $5,000-$10,000 in his carry-on bag to play poker recreationally. Mr. Nabil-Eastlund declined to answer and asked if cash was prohibited on the aircraft. He was ultimately permitted to proceed to his gate with his cash. As a result of this experience and his knowledge of TSA's cash seizure policy or practice, Mr. Nabil-Eastlund (who travels regularly with cash as a recreation poker player) takes burdensome precautions, including making a special appointment with his bank to secure fresh bills directly from the Federal Reserve that federal agencies cannot accuse of being illicit or smelling of drugs.

190. On August 11, 2011, TSA Screeners detained Michael Gordon and his possessions at the transportation security screening checkpoint at Logan International Airport (BOS) in Boston after TSA Screeners found $60,000 in his carry-on bag. Mr. Gordon and his possessions were held at the checkpoint for up to 15 minutes until law enforcement officers arrived. No transportation security or other valid reason for the TSA detention was evident; the presence or amount of the cash was the sole basis.

191. Documents obtained under FOIA related to the Buffalo Niagara International Airport (BUF) in New York indicate that TSA Screeners there regularly exceed their statutory authority by detaining travelers with cash and sometimes questioning them about that cash. For example:

    a. A BUF Transit Authority Police Department Police Report dated December 17, 2016 states that on that day a traveler was "**stopped by the TSA** at the BNIA checkpoint with a large amount of U.S. currency on his person and carry on backpack held a Jet Blue Airlines ticket for flight# 1001 to JFK (NYC) . . ." (emphasis added).

    b. The same December 17, 2016 BUF Transit Authority Police Report also explains that the cash was not found while looking for weapons or explosives, but in a search for the cash itself after a TSA Screener operating an X-Ray machine identified it as cash: "TSA Supervisor C. Moore . . . stated that a male attempted to come through lane 4 of the checkpoint with a large sum of US currency. TSA Officer B McMillan was operating the x-ray machine and observed the currency in the subjects backpack. TSA Officer S Greiner searched the subjects bag, locating the currency, who then notified Supervisor Moore."

    c. Another BUF Transit Authority Police Department Police Report states that on February 27, 2016, a "subject was **stopped by TSA personal** [sic] at the

checkpoint with a large sum of US currency. The subject was traveling with four (4) large bundles of US currency, which was located in his shoes in his carry-on bag. The bundle appeared to be mostly $20 bills." (emphasis added).

d. Another BUF Transit Authority Police Department Police Report states that on November 30, 2016, TSA interviewed a traveler about a "large amount of U.S. currency he was found to be carrying by the TSA at the BNIA checkpoint." The report states that the traveler "was attempting to return home to NYC when **stopped at the checkpoint with the cash**." (emphasis added).

e. Another BUF Transit Authority Police Department Police Report states that on May 8, 2017, a traveler "was found by TSA to be carrying a large amount of U.S. Currency inside of a large wallet that was inside of his purse. Wallet containing the currency was placed inside of a gray plastic TSA property bin which was **turned over to the Reporting Detective by TSA**." (emphasis added).

f. Another BUF Transit Authority Police Department Police Report states that on March 14, 2019, TSA Screeners encountered two travelers at "lane 4 of the TSA Security Checkpoint at BNIA" and "Suspect 2 **was asked by Reporting Officer if he was also carrying currency** he then replied yes cash **with the assistance of TSA Cheryl Hamm did locate in suspects backpack a plastic bag containing money**." (emphasis added.)

g. Another BUF Transit Authority Police Department Police Report states that on April 18, 2017, "TSA SUPERVISOR CILANO" questioned a passenger about the cash found in his luggage and then escorted the passenger to the reporting police officer: "CILANO ASKED" "IS THIS CASH?" SUB STATED "YES" CILANO STATED "THATS [sic] A LOT OF MONEY" AND THE SUB SAID

"ITS [sic] TO BUY AND [sic] ENGAGEMENT RING." CILANO ASKED IS THERE AND [sic] A REASON ITS [sic] PACKAGED LIKE THAT? SUB STATED "THATS HOW I DO IT" AT THIS POINT SUPERVISOR CILANO DID BRING THE SUB BACK TO RO [the reporting officer]."

h. Another BUF Transit Authority Police Department Police Report dated April 1, 2018 documents that TSA Supervisor Cilano told a passenger that the passenger was required to speak with law enforcement about the "Large amount of currency" in his carry-on luggage. The reporting police officer "was alerted by TSA Supervisor Cilano that the above listed subject had a "Large amount of currency" in his carry-on bag. **TSA Supervisor Cilano stated that** when **he informed the subject that she would need to speak with an Officer**, she stated to him that the money in his bag was for a down payment on a 2006 Lexus that she was flying to NYC to buy." (emphasis added).

i. Another BUF Transit Authority Police Department Police Report dated March 21, 2019 documents that TSA Supervisor Cilano escorted a passenger with a "large undetermined amount of currency" in his carry-on luggage to the reporting police officer at the police podium: "TSA informed me that they found a large undetermined amount of currency in subject 1's carry-on bag. The subject and his 2 bags came thru security lane number 4A and his back pack only was inspected by TSA supervisor Jay Cilano. **Subject with his bags in hand was escorted to police podium** so that R/O could speak with him."

192.      Documents obtained under FOIA related to the Buffalo Niagara International Airport (BUF) in New York also indicate that $10,000 continues to be TSA's threshold for seizing cash and alerting law enforcement. For example:

j. A BUF Transit Authority Police Department Police Report states that on November 14, 2018, "PATROL WAS APPROACHED BY TSA AGENT CRAIG BURNS (REPORTING PERSON-1) STATING THEY HAVE A TRAVELING PASSENGER (SUBJECT -1) **WITH OVER $10,000.00 U.S. CURRENCY IN HIS CARRY ON BAG.** SUBJECT -1 WAS **ATTEMPTING TO CLEAR THE SECURITY CHECKPOINT** AND BOARD JET BLUE FLIGHT #1901." (emphasis added)

k. Another BUF Transit Authority Police Department Police Report states that on March 16, 2017: "TAPD OFCS..JAWOREK AND LAMONTE RESPONDED TO LANE #4 AT THE BNIA CHECKPOINT. TSA AGENT LEIDENFROST TOLD OFCS.THAT THE SUBJECT HAD A [sic] **APPROX. $11,000 IN US CURRENCY IN HIS POSSESSION**." The same report also states: "TSA personal [sic] did discover the large sum of currency **after the screening process** on lane 4." (emphasis added).

193. These temporary TSA seizures of travelers' cash, carry-on luggage, and/or personal effects meaningfully interfere with these travelers' possessory interest in their property. For example, while TSA Screeners seize their cash and/or carry-on luggage, travelers cannot take their cash and/or carry-on luggage with them to their boarding gate, use items in their carry-on luggage,or use the cash to purchase items in the airport.

194. Travelers typically keep valuable or important personal effects and property in their carry-on luggage that they cannot realistically leave behind, including cell phones, laptop computers and tablets, wallets, credit cards, passports and other identification documents, travel documents, appointment books, medications, essential toiletries, and clothes. This is particularly true while going through TSA transportation security screening, because travelers are typically instructed by

TSA to remove everything from their pockets and are typically not permitted to have anything on their person that will cause TSA metal detectors or other screening devices to alert.

195. Because these TSA seizures are of a traveler's valuable or important possessions, which typically include their cash and their carry-on luggage (including their personal effects stored in their carry-on luggage), the traveler is effectively seized when their property is seized.

196. TSA's policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons after the transportation security screening has concluded is ultra vires because it exceeds TSA's statutory authority to exercise administrative powers related to transportation security and to conduct "day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation," 49 U.S.C. § 114(e)(1), which TSA defines as "the inspection of individuals and property for weapons, explosives, and incendiaries," 49 C.F.R. § 1540.5.

197. TSA's policy or practice of seizing travelers' cash, carry-on luggage, personal effects, and/or persons after the transportation security screening has concluded and without reasonable suspicion or probable cause also violates the Fourth Amendment's prohibition against unreasonable searches and seizures by seizing property and persons beyond the time and scope of the mission for which the agency's initial lawful administrative search was initiated.

**DHS/DEA Allegations**

198. Every year, DHS and DEA conducts tens of thousands of seizures of cash, including hundreds or even thousands of seizures of cash from travelers at U.S. airports.

199. From 2009 to 2013, DHS and DEA seized over $2 billion in currency.

200. DEA made more than 80,000 seizures of currency (totaling over $4 billion) from FY 2007 to FY 2016, which is approximately 80% of all federal seizures of cash by DOJ agencies during that period. From 2009 to 2013, DHS and DEA interdiction Task Force Groups, which

operate at airports and other mass transportation facilities, seized $163 million in more than 4,000 individual currency seizures.

201.   DEA has operated an "airport interdiction task force" at one or more U.S. airports since at least 1975.

202.   DEA sometimes refers to its airport interdiction activities as "Operation Jetway." Operation Jetway is also the name of DEA's transportation interdiction training course for airports. Operation Jetway is the airport counterpart to DEA's Operation Pipeline, which is DEA's nationwide highway interdiction program that focuses on roadway interdiction of passenger and commercial motor vehicles.

203.   The Operation Jetway airport interdiction program was established in 1993 with DEA as the lead agency, to provide standardized training and to collect and analyze arrest and seizure data from federal, state, and local drug interdiction units working at airports and other mass transportation facilities.

204.   In 2001, DEA collected data on Operation Jetway airport interdiction operations at 77 U.S. airports.

205.   Upon information and belief, DEA now operates an Operation Jetway airport interdiction program at every major commercial airport in the United States.

206.   A 2017 report by the DOJ Office of Inspector General reviewed a sample of 100 DEA currency seizures that "appeared to have occurred without a court-issued warrant and without the presence of narcotics" and "found that 85 of the 100 seizures occurred as a result of interdiction operations at transportation facilities, such as airports" Of those 85 seizures, 46 occurred at

airports. DOJ Office of Inspector General, *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* at iii, 22 (Mar. 2017) ("2017 OIG Report"), https://www.oversight.gov/sites/default/files/oig-reports/e1702.pdf.

207.   DEA's airport interdiction and seizure practices focus on seizing cash, not on stopping

crime. The 2017 OIG Report found that DEA could verify that "only 29 of the 85 interdiction seizures, had (1) advanced or been related to ongoing investigations, (2) resulted in the initiation of new investigations, (3) led to arrests, or (4) led to prosecutions." This "risks the reality that [DEA] is more interested in seizing and forfeiting cash than advancing an investigation or prosecution." 2017 OIG Report at iii; id. at 20 ("many of the DEA's interdiction seizures may not advance or relate to criminal investigations").

208.  Because the vast majority of interdiction encounters and seizures are conducted "absent any preexisting intelligence of a specific drug crime," there are "potential risks to civil liberties associated with [so-called] cold consent encounters that occur during transportation interdiction operations." 2017 OIG Report at iii; id. at 21-22 ("interdiction operations at transportation facilities can be particularly susceptible to civil liberties concerns").

209.  DEA Agent Anthony DiGiovanni's status as an instructor for DEA interdiction efforts, including Operation Pipeline and Operation Jetway, demonstrates that DEA's policies or practices described and challenged in this lawsuit are not the acts of rogue or poorly trained DHS or DEA interdiction agents, but are the policies or practices actually being taught by DEA interdiction instructors such as Mr. DiGiovanni and implemented by DHS and DEA interdiction agents such as Mr. DiGiovanni, Mr. Muise, and Mr. Schaffner at U.S. airports.

**A.  DHS and DEA's unconstitutional policy or practice of conducting suspicionless non-consensual seizures of air travelers based solely on the knowledge or belief that they are traveling with a "large" amount of cash**

210.  DHS and DEA's airport interdiction and seizure practices are typically not conducted as part of ongoing or known criminal investigations, are not random, and are not based on agents' identification of behaviors that give rise to reasonable suspicion or probable cause.

211.  Instead, DHS and DEA interdiction agents have a policy or practice of conducting suspicionless non-consensual seizures of airport travelers based solely on the agents' knowledge or

belief that those specific travelers are traveling with a "large" amount of cash. Because that knowledge or belief does not itself give rise to reasonable suspicion, these targeted airport seizures are suspicionless non-consensual seizures that violate the Fourth Amendment.

212. Especially after the September 11, 2001 terrorist attacks, commercial airports in the United States have become high-security areas manned and patrolled by numerous government agents, including TSA Screeners and law enforcement officers such as DEA and various DHS agencies and "Task Force Officers".

213. At commercial airports, while the secured area past the transportation security screening checkpoint is particularly high security, the entire airport is a high-security area, including the baggage claim area, ticketing counter, and luggage drop-off areas, which are routinely patrolled and monitored by law enforcement officers and other government or airport personnel.

214. At commercial airports, air travelers know that they can be prevented from flying, detained, arrested, and face criminal charges and/or civil fines for making careless comments about certain topics related to transportation security, such as any statements—even including obvious jokes—alluding to a traveler possessing weapons or explosives.

215. Air travelers at transportation security screening checkpoints are legally required to present their identification documents and boarding pass and to truthfully answer questions posed by TSA Screeners about their identity, travel plans, the purpose of their travel, and the contents of their luggage and other belongings on their person, including whether they have any weapons, explosives, incendiaries or other prohibited items. Airline travelers know that failure to comply with these requirements, questions, and searches is likely to result in them being prevented from flying, detention, criminal charges, and/or civil fines.

216. Even after passing through transportation security screening checkpoints, air travelers are legally required to comply with the lawful commands of TSA officials and other government

personal. Air travelers know or are likely to reasonably believe that failure to comply with these requirements, questions, and searches is likely to result in them being prevented from flying, detention, arrest, criminal charges, and/or civil fines.

217. Even when air travelers are not at transportation security screening checkpoints, air travelers may be required to submit to "Administrative Searches" or "Special Needs Searches" of their person and/or luggage by TSA—or by non-TSA personnel, including law enforcement officers, acting at TSA's direction—to ask about and search for weapons, explosives, incendiaries, or other prohibited items. These "Administrative Searches" or "Special Needs Searches" may occur in any area of the airport, such as during Gate Screenings at the boarding gate, Reverse Screenings upon arrival at a flight's destination, or Regulatory Inspections. See TSA Management Directive No. 100.4 (Sept. 1, 2009). Air travelers know or are likely to reasonably believe that failure to comply with these requirements, questions, and searches is likely to result in them being prevented from flying, detention, arrest, criminal charges, and/or civil fines.

218. In these contexts—which can arise in any area of an airport—"[s]creening and searches may be conducted by TSA personnel or at the direction of TSA, and may be initiated by TSA Headquarters or local TSA officials. TSA will consult and coordinate with Federal, state, and local law enforcement officials, as well as affected transportation entities, as appropriate, when conducting these operations." TSA Management Directive No. 100.4 (Sept. 1, 2009).

219. Among the personnel that TSA deploys to conduct such "Administrative Searches" or "Special Needs Searches"—which can arise in any area of an airport—are armed Visible Intermodal Prevention and Response ("VIPR") teams designed to "augment the security of any mode of transportation. VIPR teams may comprise any asset of DHS, including FAMs (Federal Air Marshals), TSIs (Transportation Security Inspectors), canine detection teams, and detection technology." TSA Management Directive No. 100.4 (Sept. 1, 2009).

220.  Given the high-security environment of an airport and federally mandated compliance with these security procedures—which can arise in any area of an airport and involve multiple different government officials from different agencies—when air travelers are approached by law enforcement officers such as DHS or DEA interdiction agents in an airport, most air travelers reasonably believe the encounter is part of their ongoing obligation to comply with federal government questions and searches that are attendant to air travel at commercial airports—especially when the agents ask targeted, individualized, or personalized questions similar to those asked at the transportation security screening checkpoint.

221.  Given the high-security environment of an airport and federally mandated compliance with these security procedures—which can arise in any area of an airport and involve multiple different government officials from different agencies—when air travelers are approached by law enforcement officers such as DHS or DEA interdiction agents in an airport, most air travelers reasonably believe they are legally obligated to cooperate with those officers, including truthfully answering the officers' questions and submitting to a search of their person and luggage—or likely risk being prevented from flying, detention, criminal charges, and/or civil fines.

222.  This is particularly true when law enforcement officers begin the encounter by asking questions that seem related to transportation security, such as questions about an air traveler's identity, travel plans, the purpose of their travel, or the contents of their luggage and other belongings. This is also particularly true when law enforcement officers ask targeted questions or make statements demonstrating that they already know specific personal information about the traveler, such as the traveler's name, itinerary, or that the traveler is traveling with cash.

223.  For all of these reasons, and as exemplified by Plaintiff Franklin's suspicionless seizure by Defendant DHS agent Muise and by the additional examples herein, when DHS/DEA interdiction agents approach and ask targeted questions of specific travelers at airports who the

DHS/DEA agents know or believe to be traveling with a large amount of cash, these are non-consensual encounters.

224.   As a result, in the federal-government-controlled post-9/11 high-security context of a commercial airport, when a federal law enforcement officer asks an air traveler a question indicating that the federal law enforcement officer knows something about the traveler's circumstances—e.g., the traveler's name, the traveler's itinerary, or that the traveler is traveling with cash—the traveler is not free to walk away or to decline to answer the federal law enforcement officer's questions and is seized by the federal law enforcement officer.

225.   DHS/DEA interdiction agents have a policy or practice of conducting these airport seizures of targeted travelers based solely on the DHS/DEA agents' knowledge or belief that the targeted travelers are traveling with large amounts of cash. This policy or practice of conducting targeted suspicionless non-consensual seizures in the post-9/11 high-security context of a commercial airport—where no reasonable person would feel free to walk away from or ignore federal law enforcement officers—violates the Fourth Amendment.

226.   DHS/DEA's policy or practice of conducting suspicionless non-consensual seizures of air travelers based solely on DHS/DEA interdiction agents' knowledge or belief that those specific travelers are traveling with a "large" amount of cash is related to DHS/DEA interdiction agents' policy or practice of seizing for civil forfeiture any cash found that totals more than $5,000—because DHS and DEA deems "large" amounts of cash presumptively subject to seizure regardless of whether there is probable cause for the seizure. This second policy (described more fully below) is also exemplified by Defendant Muise's seizure of Plaintiff Franklin's cash on November 13, 2019 and by the additional examples herein.

**B. DHS/DEA's unconstitutional policy or practice of seizing for civil forfeiture "large" amounts of cash from air travelers because DHS/DEA deem "large" amounts of cash presumptively subject to seizure**

227. In addition to their policy or practice of conducting suspicionless non-consensual seizures of air travelers at airports, DHS and DEA interdiction agents also follow a related policy or practice of seizing cash without probable cause from travelers at U.S airports for civil forfeiture based on the presence of a "large" amount of cash in the traveler's possession—because DHS and DEA deem "large" amounts of cash presumptively subject to seizure, regardless of whether there is probable cause for the seizure.

228. DHS and DEA interdiction agents follow a policy or practice of seizing cash from travelers at U.S. airports when the amount of cash meets or exceeds a threshold amount that DHS/DEA interdiction agents consider "suspicious" and presumptively subject to seizure and civil forfeiture, regardless of whether there is probable cause for the seizure.

229. $5,000 is the typical threshold amount of cash that DHS/DEA interdiction agents deem presumptively subject to seizure for civil forfeiture, regardless of whether there is probable cause for the seizure. The specific threshold amount deemed presumptively subject to seizure may vary by interdiction agent and may be as low as $1,000 or as high as $10,000.

230. The vested interest the interdiction agents have due to the "sharing arrangement" for forfeited money creates confirmation bias in their investigation and definition of just what is "suspicious."

231. Franklin was subjected to DHS and DEA's policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture when it is deemed presumptively subject to seizure because it totals $5,000 or more.

232. Both of the aforementioned DHS and DEA airport personal seizure and cash seizure policies or practices violate the Fourth Amendment's prohibition against unreasonable searches and seizures.

233. Due to his knowledge of these DHS and DEA airport personal seizure and cash seizure

policies or practices, Franklin has refrained and will continue to refrain from the entirely lawful activity of flying commercially with "large" amounts of cash.

### C. Nationwide examples of DEA agents following the challenged DHS and DEA airport personal seizure and cash seizure policies or practices

234. Franklin's experience is just one example of DHS and DEA's airport personal seizure and cash seizure policies or practices. Counsel is aware of the following examples that demonstrate either or both of DHS/DEA's challenged policies or practices on an ongoing national scale.

235. In January 2016, two DEA interdiction agents at the Cincinnati/Northern Kentucky International Airport (CVG) testified that, pursuant to their training, $5,000 carried by any air traveler was presumptively subject to seizure. One officer testified that pursuant to federal policy, "my understanding was anything over $5,000 was subject to seizure." Dep. of Christopher Boyd, No. 2:14-cv-125, Dkt. 76-1 at 34 (Jan. 20, 2016). Another DEA interdiction agent explained that "DEA passed out a card with the threshold levels on them," explaining that $5,000 was a "federal threshold." He went on to explain that "98 percent of the time we don't entertain anything less than the threshold, which would be $5,000." Dep. of William Conrad, No. 2:14-cv-125, Dkt. 76-2 at 28-30 (Jan. 21, 2016).

236. Upon information and belief, these DEA interdiction agents were likely referencing the DOJ Asset Forfeiture Policy Manual's instruction that to forfeit cash, the "minimum amount must be at least $5,000," which "generally must be met, preferably before property is seized." DOJ Asset Forfeiture Policy Manual (2019) Ch. 1, https://www.justice.gov/criminal-afmls/file/839521/download; *see also* DOJ Asset Forfeiture Policy Manual (2016) Ch. 1 (same); DOJ Asset Forfeiture Policy Manual (2013) Ch. 1 (same).

237. Given these DEA interdiction agents' testimony, it is apparent that at least in some instances, DOJ's minimum forfeiture policy has been taught to or interpreted by DEA interdiction agents as a presumptive policy to seize any amounts of cash totaling $5,000 or more. Indeed, the

DOJ Office of Inspector General "highlight[ed] one such seizure . . . that was of particular concern because DEA agents and task force officers seized concealed currency from a piece of checked luggage without attempting to question the owner or otherwise conduct any investigation." 2017 OIG Report at 27.

238. On May 26 2020, DEA agents seized an adult male domestic air traveler at Minneapolis−Saint Paul International Airport (MSP) and his cash. The agents told an airline agent to call the man's name over a speaker; when he heeded this DEA summons, the agents conducted a non-consensual interrogation, search, and seizure. The traveler had no illegal drugs or contraband. The man did not feel free to walk away or to decline to answer the DEA agents' questions after they summoned him in the airport. The DEA agents seized over $10,000 from the man, explaining: "You have to have a legitimate reason to travel with a large amount of currency"—even though traveling with any amount of cash is entirely lawful, including for no reason at all. The air traveler was not arrested or charged with any crime.

239. On or about March 11, 2019, DEA agents at Chicago's O'Hare International Airport (ORD) approached domestic air traveler Jordan Brooks as he was about to board his departing flight for California and began interrogating him about whether he had cash in his carry-on luggage, presumably because TSA Screeners had notified the DEA agents about the cash. The DEA agents interrogated Mr. Brooks solely on the basis of their knowledge or belief that he was traveling with a large amount of cash. He did not have any illegal drugs, contraband, or prohibited items, and the DEA agents had no reason to think that he did. Nevertheless, Mr. Brooks did not feel free to walk away or to decline to answer the agents' questions at any time. Almost immediately, they asked if he had any cash, and when he said yes, they seized for civil forfeiture his entire $16,000 in lawfully earned earnings. The amount of cash was the sole basis for the seizure—which is not a constitutionally valid reason. Mr. Brooks was not arrested or charged withany crime.

240. On November 13, 2018, at the Eugene Airport in Oregon (EUG), DEA agents interrogated an adult male domestic air traveler after the traveler and his possessions were seized by TSA and placed in an interrogation room solely because he was traveling with approximately $100,000 in cash. The DEA agents, like the TSA Screeners, detained and interrogated him in the room based solely on the fact that he was traveling with a large amount of cash. The traveler had no illegal drugs or contraband. At no point did he feel free to walk away or to decline to answer the DEA agents' questions. The DEA agents seized the $100,000 for civil forfeiture without probable cause. The traveler was not arrested or charged with any crime. After the traveler retained an attorney, all his seized money was eventually returned, but he had to pay one third of the recovered money to his attorney as a contingency fee.

241. On August 27, 2018, Youngmin Peter Han was traveling from New Jersey to California when TSA Screeners saw him move cash from his jacket to his bag while going through the transportation security screening. When he landed at the Dallas-Fort Worth (DFW) airport for a layover, three or four DEA agents approached him and identified themselves as DEA agents. Mr. Han—who had no contraband or prohibited items—did not feel free to walk away or to decline to answer their questions at any time, including when the DEA agents immediately asked Mr. Han if he had a "large" amount of cash with him. When he said yes, they searched him and seized over $18,000, most of which was the proceeds from the sale of his car. Mr. Han was not arrested or charged with any crime. The money was eventually returned several months later. But as a result of this encounter and his knowledge of DEA's airport personal seizure and cash seizure policies or practices, Mr. Han will not consider flying with a large amount of cash again—even though it is entirely lawful to do so.

242. On March 26, 2018, DEA agents approached domestic air traveler Tom Hill near his boarding gate at the JFK Airport in New York City, showed their badges, and questioned him about

his backpack. He did not feel free to walk away or to decline to answer their targeted questions. The DEA agents interrogated Mr. Hill because they knew he had $62,000 in cash in his backpack—a fact he voluntarily disclosed to TSA when going through the transportation security screening. He had no contraband or prohibited items, and the DEA agents had no reason to think that he did. The DEA agents seized the money for civil forfeiture despite Mr. Hill's detailed explanation of the source and purpose of the cash, which was part of an ongoing business deal.

243.   Mr. Hill was not arrested or charged with any crime. A year later, after Mr. Hill retained counsel, the $61,000 was finally returned to Mr. Hill ($1,000 went unaccounted for by DEA).

244.   On March 12, 2018, four plainclothes DEA agents at the Detroit Metropolitan Wayne County Airport (DTW) positioned themselves directly between domestic air traveler Qui Ta and his boarding gate in order to ask him questions about the cash they knew he was traveling with, presumably because they were alerted by TSA Screeners as a result of his transportation security screening. Even though he had no contraband or prohibited items, and the DEA agents had no reason to think he did, the DEA agents blocked his path and interrogated him based solely on their knowledge of the presence and amount of cash in his carry-on luggage. He did not feel free at any point to walk away or to decline to answer their questions, including when—almost immediately upon conducting this non-consensual seizure—the agents asked, "Do you have money with you?" and "How much?" Qui Ta answered truthfully that he was traveling with approximately $34,000 from the sale of his house. Upon seeing the cash, the DEA agents grabbed Qui Ta's backpack and said, "Come with us." They took Qui Ta and his wife to an interrogation room with four or five law enforcement officers present. They searched through all of the couple's luggage and possessions, humiliating them, and seized all of their money. Qui Ta and his wife missed their flight and their vacation was ruined. Neither Qui Ta nor his wife were arrested or charged with any crime. Eventually, Qui Ta accepted a settlement for the return of $29,000 of his unconstitutionally

seized $34,000.

245.    In February 2018, domestic air traveler Josh Gingerich was seized by DEA interdiction agents at Chicago's O'Hare International Airport (ORD) and taken "down to a dingy basement room" with "no cameras… no nothing" for interrogation about why he was traveling with $29,000 in cash after a TSA agent saw cash in his backpack and tipped off the DEA agents. Mr. Gingerich had no illegal drugs or contraband and the DEA agents had no reason to think he did. The DEA agents seized the $29,000 from Mr. Gingerich despite his plausible explanation that he had the money to purchase used vehicles on a buying trip for his truck-flipping business in California. Mr. Gingerich was not arrested or charged with any crime.

246.    On or about September 27, 2017, at the San Francisco International Airport (SFO), DEA interdiction agents tapped a male domestic air traveler on the shoulder at baggage claim, asked his name, and identified themselves as DEA agents. He did not feel free to walk away or to decline to answer the DEA agents' questions. The DEA agents immediately forced him to open his checked bag, which contained $87,000 in cash. He had no illegal drugs or contraband and the DEA agents had no reason to think he did. He explained that he worked in event planning and marketing and that the cash was to book a high-profile rap artist. The DEA agents immediately seized the cash for civil forfeiture. When the traveler asked what he did wrong, a DEA officer responded, "Nothing." This air traveler's event-planning business was irreparably damaged by the seizure of all or nearly all of its operating revenue. The air traveler was not arrested or charged with any crime.

247.    On August 29, 2016, Harlan Hunter III and his mother were flying domestically from thePhiladelphia International Airport (PHL) to San Francisco. DEA agents seized Mr. Hunter and hismother at their boarding gate and told them that their carry-on luggage must be searched. There was no consent sought or given. The DEA agents told Mr. Hunter to follow them to an

interrogation room, where he told them that the approximately $45,000 he and his mother were traveling with was for a semi-trailer truck that his step-father needed for his work. Mr. Hunter and his mother had no illegal drugs or contraband, and the DEA agents had no reason to think they did. Instead, the sole basis for their seizure was the DEA agents' knowledge or belief that they were traveling with a large amount of cash. Mr. Hunter and his mother did not feel free to walk away when approached by the DEA agents at the boarding gate, to decline the DEA agents' search of their luggage, or to decline to answer the DEA agents' questions about their cash. The only explanation the DEA agents gave when they ultimately seized Mr. Hunter's and his mother's cash for civil forfeiture was that it was suspicious for the cash not to be packed in an envelope. No other reasonable suspicion or probable cause was proffered, and neither Hunter nor his mother were arrested or charged with any crime.

248.    On February 19, 2015, despite finding no illegal drugs, contraband, or prohibited items,DEA agents seized $43,923 from domestic air traveler Vu Do at the JFK Airport in New York. He had had no contraband or prohibited items and the DEA agents had no reason to think he did. Themoney was lawfully earned from his two nail salon businesses and was intended to assist his brothers in California, who had recently suffered financial losses. Vu Do was not arrested or charged with any crime. In June 2015, Vu Do sued DEA over the unlawful seizure. The complaint states that Vu Do has never been charged, arrested, or convicted for any crime under the Controlled Substances Act. The complaint explains that Vu Do (who was traveling domestically) "did not know that it was a violation of Federal regulations to carry cash in excess of $5,000 at the time of the seizure." *See* Complaint, *Vu Do v. DOJ & DEA*, No. 1:15-cv-3553, Dkt. 1 (June 17, 2015). Because no such violation exists, upon information and belief, when DEA agents seized Vu Do and his cash, they (wrongly) informed him that traveling with $5,000 is unlawful—in accordance with DEA interdiction agents' policy or practice of treating $5,000 or more as presumptively

subject to seizure for civil forfeiture.

249.    Many of DHS and DEA's suspicionless non-consensual airport interrogations, seizures, and searches are the result of TSA "flagging" travelers who are traveling with "large" amounts of cash and then notifying DHS and DEA about the traveler and the cash. Despite DHS and DEA's characterization of the ensuing stops—which are based solely on TSA-provided information that a particular traveler is traveling with a large amount of cash—as consensual in its forfeiture complaint allegations, the circumstances and the agency's treatment of "large" amounts of cash as presumptively subject to seizure indicate that these airport encounters are, as a matter of practice, unlawful seizures of airport travelers who cannot walk away or decline to answer questions when federal law enforcement officers ask them targeted and personal questions about their luggage in the high security context of an airport. For example:

> l.  A lawsuit filed in 2008 alleges that TSA Screeners detained two individuals
> "upon spotting cash" and told them to "wait while TSA contacted someone else."
> This resulted in a DEA agent arriving to continue the non-consensual seizure and
> questioning, which were based on the presence of cash. They evidently had no
> contraband or prohibited items, and the DEA agents had no reason to think they
> did. After the travelers were allowed to leave with their cash, another DEA agent
> approached them during their layover for the sole purpose of seizing their cash.
> *See* First Am. Compl., *Fiore v. Walden*, No. 2:07-cv-1674, Dkt. 11 (July 18,
> 2008).
>
> m.  In April 2011, DEA agents at Boston Logan International Airport (BOS) "met [a
> man] at an airport security checkpoint" and interrogated him based solely on the
> fact that TSA officials "discovered $29,540" in his possession. *See U.S. v.
> $29,540 in U.S. Currency*, 2013 WL 783052, at *1 (D. Mass. Feb. 28, 2013). He
> evidently had no contraband or prohibited items, and the DEA agents had no

reason to think he did. He would not have felt free to walk away from these federal law enforcement officers at an airport security checkpoint, who evidently seized him there based solely on his traveling with cash, which does not provide reasonable suspicion.

n. In June 2017, "TSA officers alerted the DEA that [a man] was traveling to Phoenix, Arizona with a large sum of currency." Based solely on that information, DEA "approached" the man "in the airside terminal and interviewed" him. *See* Complaint for Forfeiture, No. 2:17-cv-1439, Dkt. 1 (Nov. 3, 2017). He would not have felt free to walk away from these federal law enforcement officers in the high security context of an airport, and they evidently seized him based solely on his traveling with cash, which does not provide reasonable suspicion. He evidently had no contraband or prohibited items, and the DEA agents had no reason to think he did.

250. The 2017 OIG Report corroborates and raises concerns about these coordination practices between DHS, DEA, and TSA. The Report found: "DEA agents and task force officers may also initiate contacts that lead to seizures after receiving information from airport security screeners that a large volume of currency was packaged within an individual's carry-on or checked luggage." The OIG Report noted that when DEA is initiating such cash- or currency-based contacts based on "lucrative relationships" with TSA Screeners and other sources, it raises obvious "implications relating to compliance with the Fourth Amendment's protections against unreasonable searches and seizures." 2017 OIG Report at 23; *see also* DOJ Office of Inspector General, *Investigative Summary of Findings Concerning the DEA's Use of a TSA Airport Security Screener as a Paid Confidential Source* (Jan. 7, 2016), https://www.oversight.gov/sites/default/files/oig-reports/f160107b.pdf (noting Fourth Amendment

implications of "asking the TSA Security Screener to notify the DEA of passengers carrying large sums of money in exchange for a reward based on money seized by the DEA").

251.     Further demonstrating DEA's practice of conducting suspicionless non-consensual seizures at airports, the DOJ Office of Inspector General "identified practices in which [DEA task force group] members conducting [so-called] cold consent encounters may misrepresent either themselves or the ability of the traveler from whom they seize cash to contest the seizure." The OIG explained: "One such practice that we were told about in one TFG involved approaching a passenger at the gate area (after they passed through [TSA] security) and informing them that the TFG was conducting a 'secondary inspection.' We believe that using such terminology creates a risk that travelers will interpret the statement to mean they are required to consent to the encounter, similar to their obligations at a TSA checkpoint." DOJ Office of Inspector General, *Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities* at iv (Jan. 2015), https://www.oversight.gov/sites/default/files/oig-reports/e153.pdf; *Id.* at 32 ("Some TFG members conduct cold consent encounters and searches in a manner that may be misleading"). Such practices are common, and it is common for air travelers to be confused about their obligations—and their rights to not consent to be interviewed or searched—when approached in a similar manner by DHS and DEA interdiction officers.

252. In short, the practices described above and the experiences of the Plaintiff demonstrate that DHS/DEA employs policies or practices at airports nationwide that consistently violate the Fourth Amendment rights of air travelers. As a result, the agency has "creat[ed] the appearance that they are more interested in seizing and forfeiting cash than advancing potential criminal investigation[s]." 2017 OIG Report at 28.

### Claims
1.  **Claim for *Ultra Vires* Agency Action Under 5 U.S.C. §§ 701-706 (Against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America)**

253. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in preceding

paragraphs 1-252.

254. Plaintiff brings this claim against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America under the Administrative ProcedureAct, 5 U.S.C. §§ 701-706.

255. TSA's statutory authority to conduct screenings of air travelers is limited to conducting administrative searches to ensure transportation security; by law, these transportation security screenings are not for general law enforcement purposes.

256. TSA's transportation security screenings may not go beyond their limited purpose of searching for threats to transportation security.

257. No statute or regulation authorizes TSA Screeners to engage in searches, seizures, or investigations for general law enforcement purposes.

258. No statute or regulation authorizes TSA Screeners to seize property that does not threaten transportation security.

259. No statute or regulation authorizes TSA Screeners to seize potential contraband or potential evidence of a crime unrelated to transportation security.

260. No statute or regulation authorizes TSA Screeners to seize or question travelers after the transportation security screening has concluded.

261. No statute or regulation authorizes TSA Screeners to seize or question travelers to investigate potential crimes that do not threaten transportation security.

262. TSA's challenged policy or practice—having TSA Screeners seize, or arrange for the seizure of, travelers' cash, carry-on luggage, personal effects, and/or their person, based on the presence of cash on their person or in their carry-on luggage, after the transportation security screening has concluded—exceeds TSA's statutory authority to conduct administrative searches for threats to transportation security.

263. Neither TSA Management Directive No. 100.4 (Sept. 1, 2009) nor TSA Operations Directive 400-54-6 (Oct. 29, 2009) purports to give TSA Screeners the authority to conduct these ultra vires and unconstitutional seizures. TSA Screeners conduct these *ultra vires* and unconstitutional seizures pursuant to an unwritten policy or practice, or pursuant to some other non-public written policy.

264. TSA's challenged policy or practice is *ultra vires* because it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

265. TSA's *ultra vires* policy or practice affected the Plaintiff in this case for which he seeks compensatory damages and attorney fees.

266. As a direct and proximate result of TSA's ultra vires policy or practice, Plaintiff suffered and could suffer the same injury again.

267. Therefore, declaratory and injunctive relief is necessary to remedy TSA's unlawful policy or practice, which will otherwise continue.

## 2. Claim for Unconstitutional Action Under 5 U.S.C. §§ 701-706 and the Fourth Amendment (Against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America)

268. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in preceding paragraphs 1-252.

269. Plaintiff brings this claim against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and the Fourth Amendment to the United States Constitution.

270. Plaintiff brings this claim under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief against TSA, TSA Administrator Pekoske in his official capacity, and the United States of America for violation of their Fourth Amendment right to be free from unreasonable searches and seizures.

271. Even when the government has lawfully initiated a search or seizure, it may not extend or prolong

that search or seizure to pursue broader or different investigatory purposes absent reasonable suspicion or probable cause.

272. TSA airport transportation security screenings are administrative searches that may not be conducted for general law enforcement purposes; they may not go beyond their limited purpose of searching for threats to transportation security.

273. Once TSA completes the administrative search of an air traveler and their carry-on luggage and does not detect any threats to transportation security, TSA may not continue to search or seize the air traveler, their carry-on luggage, or their cash without reasonable suspicion or probable cause.

274. It is legal to travel with any amount of cash, and there are no legal requirements to report to the government that one is traveling domestically with any amount of cash.

275. An air traveler's possession of any amount of cash, by itself, is not suspicious or indicative of criminal activity; it does not give rise to reasonable suspicion or probable cause.

276. After TSA determines, in the scope of a lawful administrative search at a transportation security screening checkpoint, that nothing on a traveler's person or in a traveler's carry-on luggage presents a threat to transportation security, the Fourth Amendment prohibits TSA from (1) extending or prolonging that administrative search for other purposes or (2) seizing, or arranging the seizure of, the traveler's cash, carry-on luggage, personal effects, and/or person without reasonable suspicion or probable cause.

277. Seizing a traveler's cash, carry-on luggage, personal effects, and/or person, even briefly or temporarily, is a meaningful interference with that traveler's possessory interest in their property and freedom of movement.

278. Even if travelers are told they are free to leave the transportation security screening checkpoint or boarding gate without their carry-on luggage or their cash, they are effectively seized by the interference with their property, particularly if it includes valuable or important property such as

cash or other personal effects typically packed in carry-on luggage.

279. Plaintiff challenges TSA's policy or practice of seizing, or arranging the seizure of, travelers' cash, carry-on luggage,personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded, and without reasonable suspicion or probable cause.

280. TSA's seizure of cash, carry-on luggage, personal effects, and/or persons pursuant to this policy or practice violates the Fourth Amendment, even if the seizure is only temporary.

281. For example, TSA's temporary seizure of Franklin's carry-on luggage and personal effects after their transportation security screening concluded violated the Fourth Amendment because the seizures were beyond the scope of TSA's administrative search for threats to transportation security and were not based on reasonable suspicion or probable cause.These seizures were conducted pursuant to TSA's challenged policy or practice. The arrangement to have DHS and HPD intercept and seize Franklin and his property at the gate is equally violative.

282. TSA's unconstitutional policy or practice affected Plaintiff in this case.

283. As a direct and proximate result of TSA's unconstitutional policy or practice, Plaintiff suffered injuries and could suffer the same injury, including the deprivation of his constitutional rights and the interference with his property rights and freedom of movement.

284. Therefore, declaratory and injunctive relief is necessary to remedy TSA's unconstitutional policy or practice, which will otherwise continue.

### 3. Claim for Unconstitutional Action Under 5 U.S.C. §§ 701-706 and the Fourth Amendment (Against DHS, DHS Secretary Mayorkas in his official capacity,and the United States of America)

285. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in preceding paragraphs 1-252.

286. Plaintiff brings this claim against DHS, DHS Secretary Mayorkas in his official capacity,   and

the United States of America under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and the Fourth Amendment to the United States Constitution.

287. Plaintiffs bring this claim for declaratory and injunctive relief against DHS, DHS Secretary Mayorkas in his official capacity, and the United States of America for violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

288. It is legal to travel with any amount of cash, and there are no legal requirements to report to the government that one is traveling domestically with any amount of cash.

289. An air traveler's possession of any amount of cash, by itself, is not suspicious or indicative of criminal activity; it does not give rise to reasonable suspicion or probable cause.

290. DHS follows a policy or practice of conducting suspicionless non-consensual seizures of travelers at U.S. airports based solely on the knowledge or belief that those specific travelers are traveling with a "large" amount of cash.

291. Pursuant to this unconstitutional policy or practice, DHS seized Plaintiff and his property without reasonable suspicion.

292. DHS follows a policy or practice of seizing cash without probable cause from travelers at U.S. airports for civil forfeiture based solely on the presence of a large amount of cash, which DHS deems presumptively subject to seizure.

293. DHS follows a policy or practice of seizing cash from travelers at U.S. airports for civil forfeiture based on the presence of a threshold amount of cash that DHS considers "suspicious" and therefore presumptively subject to seizure regardless of whether there is probable cause for the seizure.

294. DHS interdiction agents follow a policy or practice of seizing cash from travelers at U.S.airports based on whether they have at least $5,000 in cash, regardless of whether there is probable cause for the seizure.

295. Pursuant to this unconstitutional policy or practice, DHS seized Franklin's cash for civil forfeiture

without probable cause.

296. The above DHS policies or practices violate the Fourth Amendment right to be free from unreasonable searches and seizures.

297. As a direct and proximate result of these policies or practices, the Plaintiff suffered injuries and damages and will suffer the same injury, including the deprivation of his constitutional rights and the deprivation and/or loss of his cash in the future.

298. Therefore declaratory and injunctive relief is necessary to remedy DHS's unlawful policy or practice, which will otherwise continue.

**4. Claim Under Federal Rule of Criminal Procedure 41(g) and 28 U.S.C. § 1331 for Return of Plaintiff's Cash and Interest on Plaintiff's Property Seized and Held for Years in Violation of the Fourth Amendment (Against DHS, DHS Secretary Mayorkas, in his official capacity, and the United States of America)**

299. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in preceding paragraphs 1-252.

300. Plaintiff brings this claim for the return of his cash, compensatory damages, and interest on his seized cash against DHS, DHS Secretary Mayorkas in his official capacity, and the United States of America under Federal Rule of Criminal Procedure 41(g), this Court's general equity jurisdiction under 28 U.S.C. § 1331, and the Fourth Amendment to the United States Constitution.

301. Franklin was aggrieved, injured, and harmed by the unlawful and unconstitutional seizure of their property—the seized cash—and continues to be harmed by the continued deprivation of the use of and interest on his seized cash. Plaintiff also seeks compensation for the vindication of his civil rights that have been violated.

302. DHS' seizure and continued retention of Franklin's cash and interest for at least twenty-four months (and continuing) violated his Fourth Amendment right because the warrantless seizure and retention were and remain without probable cause to believe that Franklin engaged in any criminal activity, that the seized cash was connected to any criminal activity, and no exception to the

warrant requirement applied or applies to the initial seizure or the retention of the seized cash.

303. For the same reasons, DHS' continued retention of Franklin's seized cash and interest on the cash violates his Fourth Amendment right and deprives him of the use and interest he would have been entitled to enjoy on his $98,020.00, had the cash never been unlawfully and unconstitutionally seized by DHS and wrongfully withheld from them for at least twenty-four months.

304. Franklin is entitled to the immediate return of the cash and interest that accrued on their $98,020 for the at least twenty-four months he has been deprived of his seized cash.

5. *Bivens* Claim for Compensatory DamagesUnder the Fourth Amendment (Against DHS Agent Terry Muise, DHS/HPD Officer Shoffner, and Houston Police Department)

305. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in preceding paragraphs 1-252.

306. Plaintiff brings this claim for compensatory damages against Defendants Muise and Shoffner, in their individual capacity, under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) and the Fourth Amendment to the United States Constitution.

307. Defendants Muise and Shoffner violated Plaintiff's clearly established Fourth Amendment right to be free from unreasonable searches and seizures by seizing his property without reasonable suspicion or probable cause.

308. Defendant Muise violated Plaintiff's clearly established Fourth Amendment right to be free from unreasonable searches and seizures by seizing his cash for civil forfeiture without a warrant or probable cause.

309. As a direct and proximate result of Defendants Muise and Shoffner's unconstitutional actions, Plaintiff suffered injuries, as set forth in the preceding paragraphs—particularly the section entitled "Injuries to Franklin"—and as may further be developed in discovery or at trial.

310. An award of compensatory damages plus interest—in amounts to be determined in discovery or at trial—is necessary to remedy the injuries caused by Defendant Muise's violations of Plaintiff's

Fourth Amendment right. Reasonable and necessary attorney fees are sought.

### Request for Relief

**WHEREFORE,** Plaintiff respectfully request that this Court:

1. Issue declaratory relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America declaring *ultra vires* and unlawful TSA's policy or practice of having TSA Screeners seize (even temporarily) air travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded.

2. Issue injunctive relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America enjoining TSA Screeners from seizing (even temporarily) air travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded.

3. Issue declaratory relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America declaring unconstitutional under the Fourth Amendment TSA's policy or practice of seizing (even temporarily) air travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause.

4. Issue injunctive relief against Defendants TSA, TSA Administrator Pekoske in his official capacity, and the United States of America enjoining TSA from seizing (even temporarily) air travelers' cash, carry-on luggage, personal effects, and/or persons—based on the presence of cash on their person or in their carry-on luggage—after the transportation security screening has concluded and without reasonable suspicion or probable cause.

5. Issue declaratory relief against Defendants DHS, DHS Special Agent Muise in his individual capacity, DHS Task Force Officer Mark Shoffner in his individual capacity, and the United States of America declaring unconstitutional under the Fourth Amendment DHS' policy or practice of seizing air travelers at U.S. airports because of DHS agents' knowledge or belief that they are traveling with a large amount of cash.

6. Issue injunctive relief against Defendants DHS, DHS Special Agent Muise in his individual capacity, DHS Task Force Officer Mark Shoffner in his individual capacity, and the United States of America enjoining DHS' policy or practice of seizing air travelers at U.S. airports because of DHS agents' knowledge or belief that they are traveling with a large amount of cash.

7. Issue declaratory relief against Defendants DHS, DHS Special Agent Muise in his individual capacity, DHS Task Force Officer Mark Shoffner in his individual capacity,, and the United States of America declaring unconstitutional under the Fourth Amendment DHS' policy or practice of seizing cash from air travelers at U.S. airports for civil forfeiture because they are traveling with at least $5,000 or any other threshold amount of cash deemed presumptively subject to seizure regardless of whether there is probable cause for the seizure.

8. Issue injunctive relief against Defendants DHS, DHS Special Agent Terry Muise in his individual capacity, DHS Task Force Officer Mark Shoffner in his individual capacity, and the United States of America enjoining DHS policy or practice of seizing cash from air travelers at U.S. airports for civil forfeiture because they are traveling with at least $5,000 or any other threshold amount of cash deemed presumptively subject to seizure regardless of whether there is probable cause for the seizure.

9. Order Defendants DHS, DHS Special Agent Terry Muise in his individual capacity, DHS Task Force Officer Mark Shoffner in his individual capacity, and the United States of America to immediately return the cash and interest that accrued on Franklin's $98,020.00 in seized cash

for at least twenty-four months that DEA unlawfully and unconstitutionally retained his seized cash and wrongfully withheld it from him.

10.     Award Franklin compensatory damages plus interest—in an amount to be proven in discovery or at trial—against *Bivens* Defendant DHS Agent Terry Muise and TFO Mark Shoffner for their violations of Franklin's Fourth Amendment right along with all other defendants jointly and severally.

11.     Enter an award against all Defendants allowing Plaintiffs to recover his compensatory damages, attorney fees, costs, and expenses in this action under 28 U.S.C. § 2412 and any other applicable provisions of law or equity.

12.     Award any further equitable or legal relief the Court may deem just and proper.

## **Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

LAW OFFICE OF GREG GLADDEN

/s/ Greg Gladden
Greg Gladden
3017 Houston Avenue
Houston, Texas 77009
Phone: 713-880-0333
Fax: 713-880-4018
State Bar No. 07991300
Fed ID No. 7236
*Attorney for Plaintiff Robert Franklin*